**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| BARBARA STANFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 10 C 6569 |
| | ) | |
| THOMAS DART, in his individual | ) | Hon. Virginia M. Kendall |
| capacity, COOK COUNTY, a unit of | ) | |
| municipal government; COOK COUNTY | ) | |
| SHERIFF'S DEPARTMENT, a political | ) | |
| subdivision; THOMAS SNOOKS, | ) | |
| SCOTT KURTOVICH, individually, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Barbara Stanfield filed a six-count complaint against Thomas Dart, Cook County, the Cook County Sheriff's Department ("Sheriff"), Thomas Snooks, and Scott Kurtovich for various claims premised on allegations of sexual harassment. The Court granted a Motion for Summary Judgment as to Defendants Dart, Kurtovich, and Cook County. (Dkt. Nos. 211, 212.) *See also Stanfield v. Dart*, 2012 WL 6720433 (N.D. Ill. Dec. 27, 2012). The trial among Stanfield and the remaining Defendants, Cook County, the Sheriff, and Snooks (hereinafter, the "Defendants") began on May 20, 2013. The allegations against the Defendants were serious and often disturbing; yet, the Defendants offered an entirely different version of the facts through testimony. In the end, the trial was a battle of credibility. After days of testimony, exhibits, and argument, a jury found for the Defendants on all eight claims and awarded Stanfield $0 in compensatory and punitive damages on May 30, 2013. On June 27, 2013, Stanfield filed the present Motion for Judgment as a Matter of Law ("JMOL") pursuant to

Fed.R.Civ.P. 50(b), or in the alternative, a New Trial pursuant to Fed.R.Civ.P. 59(a).  For the reasons set forth below, Stanfield's motion is denied.

## <u>FACTS</u>[1]

## I.     Primary Trial Testimony

This is a case of dueling testimonies and is, ultimately, a credibility dispute between Stanfield and Snooks.  Stanfield was a Correctional Officer with the Cook County Sheriff's Department working in various administrative units for the Cook County jail.  She alleged in her Complaint that, in late 2009, Snooks sexually harassed her by repeatedly touching her breasts, asking her for massages, and ejaculating on her face after trying to force her to perform fellatio on him.  As indicated by the official trial transcripts the parties requested (they did not request the complete trial), the Court treats the testimony of Stanfield, Snooks, and the seven corroborating witnesses discussed below as the "primary" evidence presented at trial.

### A.     Stanfield's Testimony

#### 1.     Stanfield's Career at the Sheriff's Department and her Initial Interactions with Snooks

Stanfield joined the Cook County Sheriff's Department in 1991.  (5/21/13 AM at p. 24.) She started out as a cadet in the Work Release unit, and eventually became an officer working in various units that serve the prisons.  (*Id.* at pp. 26–28.)  Stanfield's performance record with the Cook County Sheriff's Department contains no instances of her being disciplined for failing to perform her job.  (*Id.* at p. 197.)

Stanfield testified that she first met Snooks in August 2009 when she was walking between buildings at the Department of Community Supervision and Intervention ("DCSI").

---

[1] The Court cites to the trial transcripts ordered by the parties as: (Month/Day/Year AM/PM at p. __).

(5/21/13 AM at pp. 45, 52.) Although she had never spoken to him, he stopped her and said things like, "You look nice. Do you have a boyfriend?", "Do you cheat on him? Do you mess around on him?", and "Can you get out of town?". (*Id.* at pp. 46–47.) Stanfield responded that she did have a boyfriend but that she did not and would not cheat on him with Snooks. (*Id.* at pp. 46–47.) Snooks then asked her where she worked, and she told him she would soon be transferring to the Central Kitchen department. (*Id.* at p. 47.) Snooks replied that he was the superintendent in charge of that department and asked her if she would like to work in a recycling program that was being created. (*Id.* at p. 47.) Stanfield told him she would be interested in that program, but declined to give Snooks her personal phone number when he asked for it under the premise of calling her to talk about the program. (*Id.* at p. 47.) Later on, Snooks called Stanfield at work number and asked her to meet him in a public place to discuss the recycling program. (*Id.* at p. 53.) Stanfield agreed and suggested the Mellow Yellow in Hyde Park. (*Id.* at p. 53.) However, Snooks never came to the Mellow Yellow, and was not there when Stanfield arrived for their meeting. (*Id.* at p. 54.)

Shortly thereafter, in October 2009, Stanfield was transferred to Central Kitchen at her request. (5/21/13 AM at p. 56.) Stanfield sought this transfer because the hours would allow her to more easily take care of her daughter, who was having a difficult pregnancy. (*Id.* at p. 25.) She was only there for two weeks before she was involuntarily transferred to Records, which she later learned was done at Snooks's request. (*Id.* at pp. 57–58, 63.) Stanfield had no prior experience working in Records, but noted that Snooks's office was physically located in that department at the time. (*Id.* at pp. 56, 63–64.) While she worked in Records, Snooks determined Stanfield's eligibility for overtime, and when she filled out overtime slips, she turned them in directly to him. (*Id.* at pp. 69, 85.)

During this same time period, Stanfield began receiving numerous text messages from Snooks asking her what color bra she was wearing and to send him pictures of her in her bra. (5/21/13 AM at pp. 58–59.) She declined these requests by telling Snooks that the camera on her phone did not work, but never expressly asked him to stop making the requests. (*Id.* at pp. 59–60.) She never said "stop" because she was afraid that Snooks would "start acting crazy" by reassigning her to an undesirable department, and by otherwise harassing and bothering her. (*Id.* at p. 60.) Stanfield did not save these text messages, and she was unable to obtain information about them from her phone company. (5/22/13 AM at p. 20.)

On Stanfield's first day in Records, she noticed some of the female employees giving Snooks a massage, which she found odd. (5/21/13 AM at p. 72.) On her second day, Snooks asked her to give him a massage because he was stressed. (*Id.* at p. 71.) She complied, and after giving him a massage for some time, Desiree Sowders, a civilian employee, took over. (*Id.* at pp. 72–73.) Stanfield frequently saw women giving Snooks massages throughout the entirety of her tenure in Records. (*Id.* at p. 73.) Lieutenant Charles Luna saw Stanfield massaging Snooks and told Stanfield that she should "be careful with this guy [Snooks]." (*Id.* at p. 74.) Snooks replied, "I got cases piled up on me. I don't give an F. They can't do nothing to me. I'm getting ready to leave here." (*Id.* at p. 74.)[2]

On Wednesday, October 21, 2009, Stanfield arrived at 6:00 a.m., filled out an overtime sheet, and put it on Snooks's desk. (5/21/13 AM at p. 89; 5/21/13 PM at p. 122.) An hour later, Snooks called her and asked her to come to give him a massage, and she complied because she was ordered to do it and was "afraid" and of the "repercussions" of not doing it. (5/21/13 AM at p. 90.) Later that same day, at around 9:00 a.m., Snooks again called Stanfield, but this time

---

[2] Stanfield quotes Snooks as saying "an F," where "F" is meant to represent the word "fuck." (5/21/13 AM at p. 75.)

asked her to go to his other office, located in the basement, to discuss a project she was working on. (*Id.* at pp. 92–93.) As soon as Stanfield entered the office, Snooks asked her to lock the door, locking it himself when she refused. (*Id.* at pp. 93–94, 97.) The office had a couch, and Snooks proceeded to lay down on it and asked Stanfield to massage his legs. (*Id.* at p. 101.) When she refused, he said, "Well, how about some head?" (*Id.* at p. 101.) Stanfield said, "No, I'm not going to give you head." (*Id.* at p. 101.) Snooks then grabbed her arm and, when she threatened to yell, told her, "I don't care. Go ahead. Go ahead. I don't give an F," and then said, "I'm going to—I'm going to be leaving out of here with 80,000 a year, and I'll make your life a living F-ing hell." (*Id.* at p. 101.) Snooks then started "gesturing with his pants" and "quickly" pulled out his penis and ejaculated on Stanfield's face as he pushed her head down to his penis in an attempt to have her perform fellatio. (*Id.* at pp. 102–03.) Stanfield tried to ask Snooks to stop, but it was too late. (5/21/13 PM at p. 154.)

Stanfield knew that there were two women standing outside the door to the basement office, but she did not try to leave or call out to them because Snooks had threatened her. (5/22/13 AM at p. 22.) Snooks's penis was erect (and not flaccid) during the entire duration of the event. (5/21/13 AM at p. 104.) He used a bed sheet to clean up his semen and, as he left the room, said he was going to a meeting and was eager to share the news of the "good time" he just had. (*Id.* at pp. 105–06.) Stanfield did not say anything to him while he was leaving. (*Id.* at p. 106.) Once Snooks was gone, Stanfield used the same sheet to clean his ejaculate from her face. (5/21/13 PM at p. 113.) After washing up, Stanfield placed the sheet in a plastic garbage bag, balled it up, put it in her purse, and took it with her. (*Id.* at p. 114.)

Stanfield left the basement office after the incident but did not immediately report the incident to Snooks's superiors. (5/22/13 AM at p. 29.) Instead, she walked up two flights of

stairs—past the offices of those superiors—to the Officer's Dining Room ("ODR"), and sat quietly, thinking about what had just happened. (*Id.* at p. 29.) Rather than provide the sheet and semen to her superiors, she took it home with her and stored it in a freezer in a locked garage at her home. (5/28/13 AM at p. 92) Dr. Carl Reich conducted the undisputed tests that confirmed Snooks's semen was on the sheet. (*Id.* at p. 114.)

Stanfield left work early that day but nevertheless received overtime pay, approved by Snooks. (5/21/13 PM at pp. 121–22.) Later that week, on Friday, October 23, 2009, Snooks approached Stanfield and asked what color bra she was wearing, and also tried to unbutton her shirt. (*Id.* at pp. 129–30.) Stanfield pushed his hand away and told him to leave her alone and to stop bothering her. (*Id.* at p. 132.) A week later, on Wednesday, October 28, 2009, Snooks again tried to unbutton Snooks's blouse and "fumbled with [her] breasts." (*Id.* at pp. 133–34.) Stanfield walked away from him to prevent more groping and "may had said 'move' or 'leave me alone.'" (*Id.* at p. 134.)

Eventually, Snooks was transferred out of Records, and at that time, he contacted Stanfield to notify her that he was transferring her back to Central Kitchen. (5/21/13 PM at p. 134–35.) After Snooks was transferred, and although he was no longer her supervisor, there were two situations when Stanfield contacted him to ask for his help. First, she believed that Lieutenant Moore in Central Kitchen was picking on her, so she called Snooks to have him ask Lieutenant Moore to stop. (*Id.* at pp. 136–37.) Snooks complied with the request, and Lieutenant Moore stopped picking on Stanfield. (*Id.* at p. 138.) Second, Stanfield needed emergency time off to attend the birth of her grandson in December 2009, and she called Snooks when her initial request was denied because the schedule had already been finalized. (*Id.* at p. 139.) Snooks again helped her and approved her time off. (*Id.*)

### 2. Stanfield's Cooperation in the Investigation of Snooks's Conduct

In March of 2010, Stanfield attended a class about sexual harassment. (5/21/13 PM at p. 159.) After the class ended, she spoke to the instructor, Investigator Holman, and told him that a "powerful" person "tried to force [her] to have fellatio on him" and that he "ejaculated" on her face. (*Id.* at p. 159.) Stanfield did not mention Snooks by name. (*Id.* at p. 159.) Holman told her to contact the Cook County State's Attorney, and she replied that she was afraid they would not help her because they would be representing the perpetrator. (*Id.* at p. 160.) However, after this conversation, Stanfield gave the sheet containing Snooks's semen to her attorney in the present federal civil lawsuit. (5/28/13 AM at p. 94.) The Office of Professional Review ("OPR") eventually contacted Stanfield in mid-2010. (5/21/13 PM at p. 166.) Investigators Pon and Garcia asked her to give them a statement. (*Id.* at p. 166.) Stanfield complied and proceeded to tell them about the incident that occurred with Snooks. (*Id.* at p. 167.) Stanfield did not initiate her complaint with the OPR prior to that because she did not trust them, in part because Snooks used to work in that department. (5/21/13 PM at pp. 153–54.) She did not go directly to the Cook County State's Attorney with her charge because she thought they would be representing Snooks. (*Id.* at p. 158.) No criminal or administrative charges were ever filed against Snooks. (5/28/13 AM at p. 56.) Moreover, although Stanfield was a member of a union at the time, she also did not file a grievance with them. (5/21/13 PM at p. 203.)

Although Stanfield testified that she did not report the incident sooner and directly to her supervisor's because she was afraid of Snooks and saw him lose his temper "constantly," (5/21/13 PM at pp. 123–24), she had previously filed a claim of harassment against a supervisor. (5/22/13 AM at pp. 11–13.) In her deposition for the present lawsuit, Stanfield testified that it was a "sexual harassment" complaint, but at trial she testified that she did not mean to agree to

the Defendants' characterization of the harassment as "sexual" because it was not. (*Id.* at pp. 11–13.) Additionally, in the present case, Stanfield also knew that Snooks's superiors did not like Snooks and had had no problem disciplining him in the past, and that she would have had no difficulty reporting Snooks's conduct to them because they were frequently physically present in the Records department. (*Id.* at p. 17.)

On June 22, 2010, right around the time she filed for duty injury (as discussed below), Stanfield also filed a Sexual Harassment Complaint Form regarding Snooks to the Sheriff's Office, (5/21/13 PM at pp. 151, 153), and a claim with the Equal Employment Opportunity Commission ("EEOC"). (*Id.* at p. 156.) Eight days after Stanfield filed these claims, on June 30, 2010, Snooks retired. (*Id.* at p. 155.)

### 3. Injury Duty and Doctor's Assessments

On June 17, 2010, Stanfield filed for and was granted duty injury due to the psychological and emotional toll the incident with Snooks had taken on her. (5/21/13 PM at p. 167.) While on duty injury, Stanfield received 60% of her pay but did not work and did not receive communications from the Sheriff. (*Id.* at p. 172.) Stanfield had been seeing several doctors regarding her mental state during the time since the incident. She saw Dr. Erika Brown, her primary care doctor, in February 2010. (*Id.* at p. 168.) Stanfield told Dr. Brown about how stressed she had been feeling since Snooks sexually harassed her, and Dr. Brown subsequently prescribed anti-anxiety medication. (*Id.* at p. 168.) Stanfield also saw Dr. Joan Porche, a psychotherapist (but not a medical doctor), as recommended by the County Employee Assistance Program. (*Id.* at pp. 167–69.) Stanfield and Dr. Porche met approximately 60 times during her treatment, with each appointment lasting one hour. (*Id.* at p. 174.)

Stanfield also saw a psychiatrist, Dr. Sudhir Gohkale, in February of 2011, who prescribed her several medications, including the anti-depressant Abilify. (5/21/13 PM at p. 170.) She was seeing these doctors because she was in a "real bad depression" and could not function normally. (5/21/13 PM at p. 173.) Her symptoms improved over time, and Stanfield returned to work on July 30, 2012. (5/21/13 PM at p. 172.) When she returned, she was assigned to work in the same building in which the incident took place. (5/21/13 PM at p. 177.) Stanfield still struggles with the memory of the incident and would prefer to leave Chicago entirely, but does not have the money she would need to do so. (5/22/13 AM at p. 98.)

### B. Snooks's Testimony

Snooks flatly denied every allegation made by Stanfield: he never grabbed her, he never ejaculated on her, he never asked about her bra, he never asked to see her bra, he never sent text messages asking for photos of her in her bra, he never asked for massages of his shoulders or legs, he never received a massage from her, and he never asked for oral sex in exchange for overtime. (5/28/13 PM at pp. 139–40.) Although he never demanded back rubs, Desiree Sowders did give them to him, but that was because she was generally friendly and eager to help the team. (*Id.* at p. 164.) The practice of colleagues giving each other backrubs in Records began long before Snooks worked in the department. (*Id.* at p. 165.) He did not have anger problems and was transferred from OPR for "mutual reasons," not because he was unable to control his temper and did not get along with his superiors. (*Id.* at p. 148.) Stanfield was transferred to Records (after Snooks had been there for 1.5 weeks) because she herself requested the move. (*Id.* at pp. 162–63.) Snooks could not have offered to give Stanfield overtime in exchange for oral sex because the overtime slips did not go directly to him, and instead went through a shift supervisor before they arrived at his desk for approval. (*Id.* at pp. 165–66.) He

could not have engaged in the behavior alleged because he has no muscle mass on his left arm, and therefore did not have the strength to force Stanfield down to his penis as she described. (*Id.* at pp. 191–92.)

Snooks worked long hours and frequently slept on the hard plastic couch in the basement office. (5/28/13 PM at pp. 168–71.) He made a makeshift bed using sheets from the prison as blankets, folding some of them up to make a pillow. (*Id.* at pp. 170–71.) Snooks worked so much that he ended up putting the prison before his personal life, causing he and his wife to separate. (*Id.* at p. 153.) He was also in poor health. He had "severe diabetes," had had a heart attack and was taking medication to prevent another, and was taking Zoloft and Lorazepam for anxiety. (*Id.* at pp. 172–74.)

Most relevant among Snooks's ailments was his erectile dysfunction. (5/28/13 PM at p. 174.) He had taken the erectile dysfunction medication Cialis in the past, but stopped because it gave him severe headaches and made it hard for him to breathe. (*Id.* at p. 177–78.) Notably, he was not taking any erectile dysfunction medication in 2009 when the incident with Stanfield allegedly took place. (*Id.* at p. 178.) Nevertheless, Snooks also testified that he ejaculates while sleeping, and he occasionally detects the presence of his semen when he wakes up and feels something wet. (*Id.* at pp. 223, 228–29.) Snooks otherwise could not explain how his semen was identified on the sheet Stanfield possessed. (*Id.* at p. 223.)

When Snooks first met Stanfield, she asked him about moving to Central Kitchen because of the problems with Stanfield's daughter's pregnancy. (5/28/13 PM at p. 179.) Snooks did not know Stanfield's name at this point. (*Id.* at p. 179.) Snooks told Stanfield about a potential recycling program she could work on in Central Kitchen, but the program never came to fruition because an outside contractor won the bid to conduct the program. (*Id.* at pp. 180–

81.)  Before they knew the recycling program would not go forward, it was Stanfield who contacted Snooks about meeting at the Mellow Yellow to discuss the program, but Snooks did not attend the meeting because he was at home with his children at the time.  (*Id.* at p. 183.) Stanfield was successfully transferred to Central Kitchen, but did not like the work because it was "dirty," so Snooks offered her a position in Records, which Stanfield accepted.  (5/28/13 PM at pp. 183–84.)

While Stanfield worked in Records, she told Snooks that she could not "work with these bitches" or "stand these bitches."  (5/28/13 PM at p. 186.)  Snooks asked her to discuss the issues with him in private, and that was the only time they were in the basement office together.  (*Id.* at pp. 185–86.)  Because Snooks considered the work Stanfield was doing to be essential, he offered her the use of that basement office, which was typically unused and empty.  (*Id.* at p. 187.)  After that discussion, Snooks only worked in Records for 2-3 more weeks and did not have any additional interactions with Stanfield during that time.  (*Id.* at p. 188.)  After he left Records, Stanfield contacted him twice, once for time off, and once to report her troubles with Lieutenant Moore.  (*Id.* at pp. 189–90.)  He helped her both times.  (*Id.* at p. 190.)  Snooks retired as planned in June 2010, and his retirement had nothing to do with Stanfield's complaints.  (*Id.* at pp. 154, 226.)  If Stanfield's accusations were proven true, he could lose his pension.  (*Id.* at p. 194.)

C.    **Other Witness Testimony**

1.    **Joseph Ways**

Joseph Ways was the Executive Director of the Office of Professional Review with the Cook County Sheriff's Office when the incident allegedly occurred.  (5/23/13 PM at p. 5.)  He testified that the investigation into Snooks's conduct was slow, in part because it was difficult to

interview Stanfield, who did not make her self available to be interviewed and did not turn over the evidence for OPR to review.  (*Id.* at p. 20.)  Most victims who report similar acts do not retain an attorney and are "more willing to come forward to provide assistance" than Stanfield. (*Id.* at p. 21.)  Ways also testified that Snooks at one point worked in OPR but was transferred out because he was "not working well with other people" and was "disruptive."  (*Id.* at p. 16.) No one in OPR appeared to be friends with Snooks.  (*Id.* at p. 24.)  Finally, Ways found it strange that Snooks retired on June 30, 2010, approximately eight days after Stanfield's complaint was filed.  (*Id.* at p. 36–37.)

### 2. Keesha Marion

Keesha Marion was an administrative assistant in the Cook County Records Department and worked there with Stanfield in 2009.  (5/28/13 AM at p. 15.)  Marion testified that Snooks did ask her and other women in the department to give him massages.  (*Id.* at pp. 17, 21.)  She did not feel pressured to give Snooks the massages, and she felt she could have said "no."  (*Id.* at pp. 23–24.)  Although Snooks yelled and cursed, he was also friendly and had his employees' "backs."  (*Id.* at pp. 19, 25.)  Marion never saw Snooks do anything sexually inappropriate with Stanfield or anyone else.  (*Id.* at p. 26.)

### 3. Detective Cameron Pon

Cameron Pon was a detective for the Cook County Sheriff's Police Department assigned to OPR.  (5/28/13 AM at p. 28.)  Pon received an assignment from Ways regarding Stanfield's complaint in 2010.  (*Id.* at p. 28.)  Pon did not interview Stanfield right away because Stanfield asked to speak to her therapist first and delayed the meeting.  (*Id.* at p. 43–44.)  Pon chose not to push the issue because it was discovered Stanfield was seeking medical care and therapy.  (*Id.* at p. 43–44.)  When they did finally meet, Stanfield brought her attorney with her for the interview,

which was unusual; Stanfield's attorney even answered questions for Stanfield on several occasions.  (*Id.* at p. 48.)  The bed sheet with Snooks's DNA was never presented to Pon during the course of her investigation, and as such, Pon had concerns regarding the "chain of custody" of the sample and, therefore, its reliability.  (*Id.* at pp. 51, 55.)  According to Pon, it would be a felony if Snooks had a sexual relationship with Stanfield in exchange for overtime.  (*Id.* at p. 52.)

### 4. Investigator Georgia Garcia

Georgia Garcia was an investigator with the Cook County Sheriff's Department OPR.  (5/28/13 AM at p. 68.)  Garcia attempted to contact Stanfield to coordinate an interview 2-3 times, and Stanfield replied that she needed to contact her therapist first.  (*Id.* at pp. 74–75.)  Stanfield refused to meet with Garcia without her attorney, and when they did meet, Stanfield told Garcia that she did not report Snooks's conduct sooner because Snooks had a lot of clout and she was afraid of retaliation.  (*Id.* at p. 84.)

### 5. Dr. Jeffrey Branch

The Defendants called Dr. Jeffrey Branch as an expert witness in the field of urology.  (5/28/13 AM at p. 100.)  He reviewed Snooks's file, which he received directly from the Sheriff, but never directly examined him.  (*Id.* at pp. 102, 106.)  Dr. Branch testified that someone with insulin-dependent diabetes like Snooks could have erectile dysfunction and other abnormalities regarding the ability to ejaculate.  (*Id.* at p. 102.)  He added that Snooks was diagnosed with erectile dysfunction is 2001, but that there was no information regarding whether Snooks was suffering from the ailment in 2009 and 2010.  (*Id.* at pp. 108–09, 113.)  Although Snooks had taken Cialis and Viagra, Dr. Branch opined that it was "highly unlikely" that Snooks could have become erect and ejaculated as quickly as Stanfield described.  (*Id.* at pp. 104, 106, 114.)  Dr.

Branch did not dispute that Snooks's semen was on the sheet and that Snooks could obviously ejaculate, but stated that it could have come from a "wet dream." (*Id.* at p. 115.)

### 6. Assistant State's Attorney Holly Kremin

Holly Kremin, an Assistant Cook County State's Attorney, gave a deposition in the case that was read aloud during the trial. (5/28/13 PM at p. 120–21.) Kremin worked in the Sex Crimes Felony Unit and was assigned to work on Snooks's case. (*Id.* at p. 127.) No felony charges were filed against Snooks because Stanfield "never made herself available to the State's Attorney's Office" for an interview. (*Id.* at p. 132.) Kremin testified that Stanfield did not want to come to be interviewed in the same building the incident took place, and although Kremin explained that it would be a different floor, or could even occur at a police station located elsewhere. (*Id.* at p. 133.) Kremin ultimately only spoke to Stanfield a few times, and they primarily discussed scheduling, not the substance of Stanfield's allegations. (*Id.* at p. 137.)

### 7. Deeana McInerney

Deanna McInerney was an administrative assistant at the Cook County Department of Corrections who worked in the Records Department. (5/28/13 PM at p. 232.) She worked in the basement office for Records in 2009 when the alleged incident with Stanfield and Snooks took place. (*Id.* at p. 233.) She sat about five feet from the basement office door, (*Id.* at p. 234), but never saw Stanfield enter or exit that basement office. (*Id.* at pp. 238–39.) McInerney worked with Snooks and never heard him yell at or sexually harass anyone. (*Id.* at p. 237.)

## II. Secondary Trial Testimony

Several other witnesses testified at trial and were discussed by the parties in their briefs but do not have official transcripts. Desiree Sowders testified that Snooks did not ask her for back rubs, but that she gave them to him once every two weeks because that was common

practice in the Records department at the time. Sowders also explained that she did not believe it was sexually harassing. Dr. Carl Reich testified that the semen on the sheet belonged to Snooks, and Snooks did not contest this conclusion. Dr. Ronald Ganellen testified as an expert witness in clinical psychology and opined that, during his interview and assessment of Stanfield, she would engage in "selective reporting," which meant she tried to present information in a way that would cause people to form a particular opinion of her. He also testified that Stanfield explained that she had filed a claim of sexual harassment in the past, where she accused a supervisor of offering her time off in exchange for sexual favors. Lieutenant Charles Luna testified that he saw Stanfield giving Snooks back massages, but that it did not seem to him that people were being sexually harassed, and no one complained to him that they were being sexually harassed. Lieutenant Luna added that Snooks did have a tendency to yell and curse at people.

## STANDARD OF REVIEW

After a jury has returned a verdict, a non-prevailing party that moved for judgment as a matter of law during the course of the trial may renew that motion pursuant to Federal Rule of Civil Procedure 50(a) and request that the court enter judgment in its favor notwithstanding the jury's verdict. Fed.R.Civ.P. 50(b). If "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the [prevailing] party," it may enter judgment as a matter of law for the non-prevailing party. Fed.R.Civ.P. 50(a), (b). "The standard governing a Rule 50 motion mirrors that employed in evaluating a summary judgment motion, except that the two motions are made at different times during the proceedings before the district court." *Winters v. Fru-Con Inc.*, 498 F.3d 734, 746 (7th Cir. 2007) (citing *Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 578 (7th Cir. 2003)).

When deciding a renewed motion for judgment as a matter of law under Rule 50(b), a court's review is "limited to determining only whether any rational jury could have found for the [prevailing party], examining all evidence in the record to make that determination." *Hicks v. Forest Pres. Dist. of Cook Cnty., Ill.*, 677 F.3d 781, 787 (7th Cir. 2012) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). A court considering a motion for judgment as a matter of law must limit its inquiry "to whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed . . . ." *Mathur v. Bd. of Trs.*, 207 F.3d 938, 941 (7th Cir. 2000) (internal citations omitted). The court may not "step in and substitute its view of the contested evidence for the jury's," *id.* (citation omitted), and therefore may not re-weigh the evidence, resolve conflicts in the testimony in favor of the movant, or override the jury's determinations as to the credibility of witnesses. *See, e.g.*, *Hicks*, 677 F.3d at 787; *David v. Caterpillar, Inc.*, 324 F.3d 851, 858 (7th Cir. 2003); *EEOC v. Bd. of Regents of Univ. of Wis. Sys.*, 288 F.3d 296, 301 (7th Cir. 2002).

In the alternative to granting a motion for judgment as a matter of law, a court may grant a new trial pursuant to Federal Rule of Civil Procedure 59(a), "for any reason for which a new trial has heretofore been granted in an action at law in federal court." As with a motion for judgment as a matter of law, a jury verdict shall be upheld "as long as a reasonable basis exists in the record to support this verdict." *Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 440 (7th Cir. 2010). "A new trial should be granted only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the] conscience." *Clarett v. Roberts*, 657 F.3d 664, 674 (7th Cir. 2011) (citations omitted).

<u>**DISCUSSION**</u>

**I.        Brief Length and Font Size Violations**

As an initial matter, Stanfield (Dkt. No. 313 is 19 pages) and the Sheriff's Office (Dkt. No. 324 is 20 pages) both blatantly violate the font size and spacing requirements for briefs under Local Rule 5.2(c) and the fifteen-page limit in Local Rule 7.1.  Particularly troublesome is that Stanfield's brief is more accurately termed a "Frankenbrief": it is constructed from the parts of other briefs previously submitted to—and ultimately rejected by—the Court.  Specifically, Stanfield copied and pasted Docket Numbers 249 (Motion *in Limine* #4), 295 (Motion for a Mistrial), and 304 (Statement to Exclude Kremin's Deposition from Trial) into its present motion, editing only the font size and margin formatting to appear to come closer to the 15-page limit.  The Court therefore omits from its consideration anything beyond page 15 in either violating brief.  *See Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 632 (7th Cir. 2009) ("Because of the important function local rules like Rule 56.1 [in a motion for summary judgment] serve in organizing the evidence and identifying disputed facts, we have consistently upheld the district court's discretion to require strict compliance with those rules."); *see also, e.g.*, *Westinghouse Elec. Corp. v. NLRB*, 809 F.2d 419, 425 (7th Cir. 1987) ("Lawyers must comply with the rules and our orders rather than hope to put one over on the court and to apologize when caught.  The penalty for a violation should smart.  Even if only negligence was at work, counsel must learn to be alert."); *Campbell v. Clarke*, 481 F.3d 967, 969 (7th Cir. 2007) (discussing *in forma pauperis* motions, stating that "[p]laintiffs who attempt to deceive federal judges . . . cannot expect favorable treatment on matters of discretion.").  As such, the Court considers neither Stanfield's arguments regarding the Court's jury instructions relating to the Defendant's defense pursuant to

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 751 (1998), (Dkt. No. 313 at pp. 16–19), nor the counterarguments presented in the Sheriff's brief beyond page 15.  (Dkt. No. 324 at pp. 16–20.)

## II.     Rule 50(b) – Judgment as a Matter of Law

### A.     Stanfield Failed to Move for JMOL During Trial

As a threshold matter, the Defendants argue that Stanfield's Rule 50(b) claim fails because she did not move this Court for a judgment as a matter of law under Rule 50(a) before the case was submitted to the jury.  Under Rule 50(a):

> (1)     **In General.**  If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:
>
> > (A)     resolve the issue against the party; and
> >
> > (B)     grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.
>
> (2)     **Motion.**  A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury.  The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment.

Rule 50(b) is a "renewed" motion for judgment as a matter of law, and states:

> If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion.  No later than 28 days after the entry of judgment—or if the motion addresses a jury issue not decided by a verdict, no later than 28 days after the jury was discharged—the movant may file a renewed motion for judgment as a matter of law and may include an alternative or joint request for a new trial under Rule 59.

And "[b]ecause the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion." *Passananti v. Cook Cnty.*, 689 F.3d 655, 660 (7th Cir. 2012) (quoting Fed.R.Civ.P. 50(b), comm. note (2006 amend.)). Stanfield does not dispute that she failed to move for a Rule 50(a) judgment as a matter of law, either orally or in writing, before the case was submitted to the jury. The Court therefore denies her Rule 50(b) motion for acquittal.

### B.    Defendants Presented Sufficient Evidence to Support the Jury's Verdict

Even if Stanfield timely filed a motion for a judgment as a matter of law, the renewed motion would fail on the merits because the evidence presented by the Defendants was sufficient to sustain a verdict in their favor. When Stanfield's case was presented to the jury, the remaining claims were: (1) Title VII Gender Discrimination pursuant to 42 U.S.C. § 2000(e) against the Sheriff; (2) gender discrimination in violation of the Equal Protection Clause via 42 U.S.C. § 1983 against the Sheriff and Snooks; (3) a violation of the Illinois Gender Violence Act 740 ILCS § 82/1 against Snooks; (4) assault against Snooks; (5) battery against Snooks; (6) intentional infliction of emotional distress against Snooks; and (7) a violation of the Illinois Civil Rights Act of 2003 – 740 ILCS § 23/1 against the Sheriff and Snooks. Common to all of these claims is the question of whether or not Snooks engaged in unwelcome sexually harassing conduct as alleged by Stanfield.

Resolution of the claims boils down to a credibility dispute between Stanfield and Snooks. The Court reminded the parties of this during the trial: "[W]e are in an absolute credibility dispute. We have one woman saying this is what occurred to me, and a man saying it didn't happen. Period." (5/21/13 AM at pp. 16–17.) The jury heard the evidence and found in favor of Snooks and the Sheriff. "In cases involving simple issues but highly disputed facts (an

apt description of this case), greater deference should be afforded the jury's verdict." *Whitehead v. Bond*, 680 F.3d 919, 925 (7th Cir. 2012) (parentheses in original); *see also Tate v. Executive Mgmt. Servs., Inc.*, 546 F.3d 528, 531 (7th Cir. 2008) ("Once a jury has spoken, [courts] are obliged to construe the facts in favor of the parties who prevailed under the verdict."). The Court must therefore view the record in favor of the Defendants and can only undo their verdict if no rational jury could have found as they did.

The Court finds a rational jury could have found for the Defendants here. Snooks denied every allegation levied against him by Stanfield. He supported those denials with evidence that he suffered from erectile dysfunction and had difficulty becoming sexually aroused and maintaining an erection. He did not deny that the semen on the sheet was his, but explained that he did sometimes sleep in the basement office and that he occasionally ejaculates in his sleep. Witness testimony supported Snooks's version of the events: multiple people were outside the basement office during the time the incident was said to occur, but no one noticed anything out of the ordinary or heard any unusual sounds or yelling. Regarding the massages, he acknowledged that he received them from Stanfield's colleagues, but denied receiving or asking for them from Stanfield. Stanfield's colleagues testified that massages were given but that they were not of an inappropriately sexual nature; the environment was stressful and the employees gave each other back rubs to handle the stress. Snooks also denied sending Stanfield any text messages, and Stanfield could not counter that testimony with any evidence because she did not save the text messages.

Stanfield only put forth two pieces of noncircumstantial evidence to support her claim: her own testimony and a bed sheet with Snooks's semen on it. And, it would not have been unreasonable for the jury to find Stanfield's credibility as a witness was impeached. She testified

that she did not report the incident immediately and that, when she did, she focused on a civil lawsuit rather than a criminal prosecution of Snooks. Witnesses who investigate these allegations for the OPR described this as unusual. She stated she did not report Snooks's actions more quickly because she was intimidated by Snooks, but then testified that she continued to communicate with him and ask him for favors after he was no longer her supervisor. Witnesses also testified that Stanfield had previously reported allegations of sexual harassment, further undermining the credibility of her testimony that she was afraid of the Sheriff's Department overall and that the OPR would favor Snooks. Finally, an expert witness testified that Stanfield had a tendency to engage in "selective reporting" of facts, focusing on information and tactics she felt might improve her position. These facts are sufficient to allow a reasonable jury to render a verdict in the Defendants' favor and find that Stanfield did not prove she was sexually harassed by a preponderance of the evidence.

## III.    Rule 59(a) – New Trial

### A.    Verdict for Defendants Not Against the Manifest Weight of the Evidence

Stanfield argues in the alternative for a new trial, again alleging that the evidence presented by the Defendants' did not support a verdict in their favor. In deciding whether a verdict is against the manifest weight of the evidence for the purpose of analyzing a Rule 59(a) motion, the Court has the discretion to weigh the evidence presented by both sides to come to that determination. *Whitehead*, 680 F.3d at 928. However, the court "cannot grant a new trial just because it believes the jury got it wrong." *Id.* This is particularly true when the credibility of witnesses is the primary source of evidence because determining witness credibility is "peculiarly for the jury." *Id.* (citing *Latino v. Kaizer*, 58 F.3d 310, 315 (7th Cir. 1995)). Even if (and perhaps especially when) the evidence offered by the witnesses is contradictory, "it's the

jury's job—not the district court's job . . . —to figure out who's telling the truth." *United States v. Hassebrock*, 663 F.3d 906, 920 (7th Cir. 2011). As discussed above in the context of Stanfield's Rule 50(b) motion, the Court finds that the Defendants presented the jury with sufficient evidence to support a ruling in their favor. This verdict was therefore not against the manifest weight of the evidence, and no new trial is warranted.

### B.     Stanfield's Motion for a Mistrial was Properly Denied

Stanfield copied and pasted her Motion for a Mistrial (Dkt. No. 295) into the present motion, making minor textual edits to reflect the passage of time. The Court again denies the motion. Briefly, Stanfield argues that the Sheriff's opening statement was prejudicial and deprived Stanfield of a fair trial because it (1) improperly argued that Stanfield was obstructing the State's Attorney's investigation and (2) violated two Motions *in Limine* (Dkt. Nos. 233, 239) granted by the Court that prohibited reference to the State's Attorney when discussing the Defendants' counsel.

"To obtain a new trial based on attorney misconduct, Plaintiffs must show both that the misconduct occurred and that it prejudiced their case." *Christmas v. City of Chi.*, 682 F.3d 632, 642 (7th Cir. 2012) (citing *Whiting v. Westray*, 294 F.3d 943, 944 (7th Cir. 2002)). When the motion for a mistrial is based on improper remarks made by an attorney that were then countered by the trial court with a curative instruction, there is a presumption that the jury followed that curative instruction. *Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 446 (7th Cir. 2010). This presumption is rebuttable if there is an "overwhelming probability that the jury will be unable to follow the court's instructions and a strong likelihood that the effect of the evidence would be devastating" to the other party. *United States v. Humphrey*, 34 F.3d 551, 556–57 (7th Cir. 1994) (citations omitted). Determining whether the presumption has been rebutted requires

consideration of the "timeliness and effectiveness of the curative instruction as well as the record as a whole to ascertain whether any prejudice was alleviated." *Id.* at 557 (citing *Wilson v. Groaning*, 25 F.3d 581, 587 (7th Cir. 1994)). Rather than declare a mistrial as requested by Stanfield, the Court chose to give the jury a curative instruction regarding the contents of the Sheriff's opening statement. This did not prejudice Stanfield and did not deprive her of a fair trial because a proper, effective curative instruction was given.

First, Stanfield's attorney asked that the curative instruction be given before Stanfield took the stand. (5/20/13 AM at p. 24.) Thus, to allow the parties to reflect on their preferences for its content, the Court gave the instruction the following day, after all of the opening statements were given but before Stanfield took the stand. The Court then instructed the jury as follows:

> The lawyer's opening statements and closing arguments to you are not evidence. I told you that yesterday a number of times. The purpose of the opening is to discuss the issues and the evidence. So if the evidence at the end of this trial differs from what the lawyers said to you, it's going to be your collective memory that counts as to what the evidence is, not what they said to you yesterday.
>
> Now, I also want to inform you that Miss Stanfield, the plaintiff, is entitled to seek representation and bring claims under Title VII for sexual harassment. And that's independent and apart from any administrative process that she may or may not be required to do within her position. And it's not improper for her to have sought a lawyer and to have followed lawyer's advice.

(5/21/13 AM at p. 22.) The Court presumes the jurors adhered to this instruction and struck from their minds the inference (if any) that Stanfield hiring an attorney and listening to his advice was akin to obstructing the State's Attorney's investigation. *Pickett*, 610 F.3d at 446. This instruction was timely because it took place within the timeframe requested by Stanfield's

counsel, and it was effective because it spoke directly to the potentially problematic inferences Stanfield's counsel feared the jury would make. Moreover, as discussed at length above, the Defendants presented sufficient evidence at trial that would permit a reasonable juror to find in their favor, including testimony from Stanfield herself that she did not fully cooperate with the State's Attorney's criminal investigation of Snooks until she filed her federal lawsuit.

Second, Stanfield's counsel could have—but did not—object to the Sheriff's opening statement as it was being given, and therefore permitted the jury to hear it in its entirety rather than seek the Court's assistance before the purported damage was done. (5/20/13 AM at p. 23.) Third, although referring to the Defendants' counsel as "State's Attorneys" in the Sheriff's opening statement did violate this Court's ruling on two Motions *in Limine* filed by the Defendants, the Court properly reversed that ruling at trial because it pertained to motions filed by the Defendants themselves as an attempt to distinguish the Sheriff's arguments from Snooks's. Violating its own favorable ruling on a motion *in limine* put the previously excluded material in play—the Sheriff's counsel could have easily used another word during her opening statement. (*See* 5/21/13 AM at p. 17.) Because Stanfield cannot show that errors occurred or, if they did, that they severely prejudiced her case, the Court denies her motion for a new trial based on the Court's prior ruling on her motion for a mistrial.

### C.     Stanfield's Motion *in Limine* #4 was Properly Denied

Stanfield argues that the Court erred in denying her Motion *in Limine* Number 4. Therein, Stanfield sought to exclude evidence and arguments by the Defendants purporting to show she was injured and on worker's compensation for any reasons other than Snooks's alleged conduct. (Dkt. No. 249.) Stanfield argued that judicial estoppel prevents admitting this evidence because the Cook County Sheriff's Office already took the position that the injury did occur

based on Snooks's conduct when it awarded her worker's compensation benefits. (Dkt. No. 249.) The Defendants argued that simply awarding worker's compensation does not amount to taking an official administrative position on the cause of that injury. (Dkt. No. 262.)

Judicial estoppel "provides that a party who prevails on one ground in a prior proceeding cannot turn around and deny that ground in a subsequent one." *Butler v. Village of Round Lake Police Dept.*, 585 F.3d 1020, 1022–23 (7th Cir. 2009) (affirming the district court's grant of summary judgment based on judicial estoppel); *Commonwealth Ins. Co. v. Titan Tire Corp.*, 398 F.3d 879, 887 (7th Cir. 2004) ("Judicial estoppel prevents a party that has taken one position in litigating a particular set of facts and prevailed under that position from later reversing its position when it is to its advantage to do so." (citation and marks omitted)). The circumstances warranting the application of judicial estoppel are not "reducible to any general formulation of principle." *Matter of Cassidy*, 892 F.2d 637, 641 (7th Cir. 1990); *see also Commonwealth Ins. Co.*, 398 F.3d at 887 (stating that because it is an equitable concept, the "law in this area is flexible"). There are, however, several factors that inform a court's decision of whether to apply the doctrine in a particular case. *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001). Courts first look to whether the most recent position is clearly inconsistent with the earlier position. *Id.* Second, courts inquire whether the party's earlier position prevailed. *Id.* Third, courts determine whether "the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.*

Here, Stanfield presented no evidence that an official position was ever taken by the Cook County Sheriff's Office regarding her injury. Nor did she rebut the presumption against the inference that awarding worker's compensation is not an admission of liability under the Illinois Worker's Compensation Act: "The payment of compensation by an employer or his

insurance carrier to an injured employee shall not constitute an admission of the employer's liability to pay compensation." 820 ILCS § 305/8(b)(7). Stanfield therefore fails the first prong of the judicial estoppel test, which is fatal to her argument. The Court therefore properly found that the Defendants were not estopped from making the argument that Stanfield's injuries were not related to her employment. Moreover, as the Court previously explained, failing to allow the Defendants to make this argument would prejudice the jury in Stanfield's favor because they would have no other option but to infer that an administrative decision was rendered against the Defendants regarding the source of Stanfield's injuries. (FPTC 5/9/13 at p. 29.)

     **D.**      **Kremin's Deposition Testimony was Properly Used at Trial**

Stanfield again copied and pasted a prior substantive filing with this Court, this time her Position Statement Regarding the Testimony of Assistant State's Attorney Holly Kremin, and resubmitted it as part of the present motion. (Dkt. No. 304.) Federal Rule of Civil Procedure 32 governs the use of deposition transcripts in court proceedings. Pursuant thereto, "A party may use for any purpose the deposition of a witness, whether or not a party, if the court finds . . . that the witness is more than 100 miles from the place of hearing or trial or is outside the United States, unless it appears that the witness's absence was procured by the party offering the deposition." Fed.R.Civ.P. 32(a)(4). However, "an objection may be made at a hearing or trial to the admission of any deposition testimony that would be inadmissible if the witness were present and testifying." Fed.R.Civ.P. 32(b). Although Stanfield lists five such evidentiary issues, she only discusses four of them: "(1) whether the deposition transcript is inadmissible as hearsay, (2) whether ASA Kremin is 'unavailable' as required by FRE [Federal Rule of Evidence] 804, (3) whether the deposition testimony at issue is relevant, and if relevant, (4) whether it is unduly prejudicial." (Dkt. No. 313 at p. 10.) The Court addresses each in turn.

1.      **Hearsay**

Stanfield argues that Kremin's deposition transcript is inadmissible hearsay pursuant to FRE 801 because it is an assertion being offered for its truth.  However, Kremin's testimony would be admissible if she were present and testifying:

> [H]ad [the deponent] been then present and testifying, none of his statements could have been excluded as hearsay.  He was reporting what he claims to have experienced, not relaying what someone else told him.  Rule 32(a), as a freestanding exception to the hearsay rule, is one of the 'other rules' to which [FRE] 802 refers. Evidence authorized by Rule 32(a) cannot be excluded as hearsay, unless it would be inadmissible even if delivered in court.

*Ueland v. United States*, 291 F.3d 993, 996 (7th Cir. 2002).  Kremin's deposition transcript "reported what [she] claims to have experienced" regarding Stanfield's participation in the State's Attorney's criminal investigation of Snooks, (5/28/13 PM at pp. 120–38), and is therefore not inadmissible hearsay.

2.      **Unavailability**

Stanfield argues that Kremin was not unavailable, but incorrectly references the Federal Rules of Evidence and the prohibition of hearsay as the proper governing law, when the actual governing law is Federal Rule of Civil Procedure 32, as discussed above.  *Ueland*, 291 F.3d at 996.  The Defendants argue that Kremin was more than 100 miles away from Chicago during the trial, satisfying the standard in Fed.R.Civ.P 32(a)(4).  Furthermore, Defendants offer evidence that Stanfield at one point agreed to call Kremin to testify out of order during Stanfield's case-in-chief so she could provide live testimony and also go on her vacation, but then reneged on that agreement two weeks before trial as an apparent retaliation against the Defendants being unable or unwilling to do a videotaped deposition of Dr. Porche.  (Dkt. No. 324-1.)  Stanfield does not articulate why the Defendants' actions regarding videotaped testimony from Dr. Porche were

unacceptable or unreasonable (she did not file a Reply to the Defendants' Responses). Nor could Stanfield explain to the Court why she spent the week Kremin *was available* arguing against the admissibility of Kremin's deposition transcript for the following week, when Kremin was not available. (5/28/13 PM at pp. 96–97.) Stanfield's objection remains untimely and is once again rejected.

### 3. Relevance

Stanfield argues Kremin's testimony is "not relevant to" and does not "in any way[] rebut[] or advance[] any claim or defense" made by the Defendants. She argues that it should therefore be excluded pursuant to FRE 401: "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." This Court has repeatedly held that Stanfield's motivations for filing a federal civil lawsuit and not assisting law enforcement officials in a criminal investigation is a proper defense against Stanfield's credibility, and has specifically made this ruling regarding Kremin's testimony:

> [F]iling this lawsuit for monetary gain as opposed to for other appropriate reasons makes the Kremin's affidavit relevant. And it makes it relevant because, of course, if an individual were sexually molested at work, one would think naturally that she would be cooperative with law enforcement when given an opportunity to have charges pressed against him. There [are] myriad reasons as to why sexual offense victims [do] not. And that is up to you, Mr. Casson [Stanfield's counsel], if you want to address that at any point during the case. But [Kremin's testimony] is relevant to [the Defendants'] defense that [Stanfield's testimony is] fabricated."

(5/28/13 AM at p. 11.) In a case that is decided by a jury based upon the credibility of the witnesses, motivation for a witness's testimony is of paramount importance and is highly relevant.

### 4. Probative Value

Finally, Stanfield argues that Kremin's testimony is prohibited because its probative value is not outweighed "by the prejudice to the Plaintiff, confusion of the issues, misleading the jury and the presentation of cumulative evidence" pursuant to FRE 403. (Dkt. No. 313 at p. 14.) None of these factors are applicable and, even if they were, they do not weigh against the probative value of the evidence. At issue is the credibility of Stanfield's testimony and her motivation for filing a civil lawsuit against Snooks rather than (or in addition to) aiding the State's criminal investigation. Whether she cooperated with law enforcement officials and the State's Attorney speaks directly to that point and is therefore highly probative. To exclude this testimony, the prejudice against Stanfield would have to be "*unfair*." FRE 403. But there is nothing in the record to suggest that this is the case; that the testimony is harmful to Stanfield's case is not "unfair prejudice." Moreover, Kremin was on Stanfield's the "May Call List," (Dkt. No. 254 at p. 11–12), making any argument that she was not prepared to argue against the testimony disingenuous. For the same reasons, the testimony did not confuse the issue, mislead the jury, or present cumulative evidence. *See* FRE 403. The Court therefore denies Stanfield's Motion for a New Trial based on her claim that the admission of Kremin's deposition testimony was in error.

## CONCLUSION

For the reasons set forth above, the Court denies Stanfield's Motion for Judgment as a Matter of Law and, in the alternative, for a New Trial.


_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: March 13, 2014